UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

JONATHAN VALDEZ,                                    :

                                   Plaintiff,            :            11 Civ. 05194 (PAC) (DF)

             -against-                             :            **REPORT AND**
                                                           **RECOMMENDATION**

THE CITY OF NEW YORK, *et al.*,                      :

                                  Defendants.         :

------------------------------------------------------------------------X

**TO THE HONORABLE PAUL A. CROTTY, U.S.D.J.:**

Plaintiff Jonathan Valdez ("Plaintiff"), a pretrial detainee at the Rikers Island Jail Facility ("Rikers"), brings this action under 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq.*, and state tort law against the City of New York (the "City"), as well as New York City Department of Correction ("DOC") employees Captain Albert Butler, Captain Darnell Negron, Correction Officer Williams, Correction Officer Tiffany Kinloch, Warden Kathleen Mulvey, Warden Edmund Duffy, and Correction Officer Anton Taylor (collectively, the "Individual Defendants") (all, collectively, "Defendants").

Currently before this Court for a report and recommendation is Defendants' motion to dismiss Plaintiff's Third Amended Complaint pursuant to Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure.  (Dkt. 45.)  For the reasons discussed below, I respectfully recommend that Defendants' motion be granted in part, and denied in part.

# BACKGROUND

### A.      Factual Background[1]

According to the Third Amended Complaint, Plaintiff has been a pretrial detainee at Rikers since April 21, 2010, and has been housed, at various times during the period of his detention, in the Otis Bantum Correctional Center ("OBCC") and the George R. Vierno Center ("GRVC").  (3d Am. Compl. ¶¶ 19-20.)  Plaintiff alleges that, at one or more of these facilities, he was wrongly classified by DOC officials as an "intended contraband recipient" ("ICR") and as a member of a "security risk group" ("SRG").  Alleging that these mis-classifications, which were ongoing at the time Plaintiff filed his Third Amended Complaint, caused him to be isolated from other inmates, subjected to humiliating and invasive searches and rough treatment, and pressured to abandon the free exercise of his Catholic faith, Plaintiff seeks compensatory damages for both physical and emotional injury, punitive damages, injunctive relief, and an award of attorneys' fees and costs.

### 1.      ICR Classification

Prior to his current detention, Plaintiff was detained at Rikers on four other occasions, in 2000, 2003, 2005, and 2007.  (*Id.* ¶¶ 20, 25.)  In or about June 2000, during one of Plaintiff's prior periods of detention, a DOC correction officer classified Plaintiff with an ICR status.  (*Id.* ¶ 21.)  According to Plaintiff, an ICR classification is supposed to be reserved for those pretrial detainees and convicted prisoners (collectively "inmates") who test positive for drug use or are caught with contraband.  (*See id.* ¶ 22)  Plaintiff alleges that he has never tested positive for

---

[1] The facts set forth herein are taken from Plaintiff's Third Amended Complaint and are accepted as true for purposes of Defendants' motion.  (*See* Third Amended Complaint and Demand for a Jury Trial, dated July 10, 2012 ("3d Am. Compl.") (Dkt. 37); Discussion *infra,* at Part I.)

drugs or been found in actual possession of contraband, but, during his detention in 2000, the DOC performed a search of a highly-trafficked area and found contraband in the vicinity of Plaintiff.  (*Id.* ¶¶ 23, 24, 26.)  Although the contraband was found more than 10 feet from Plaintiff, the DOC classified Plaintiff as ICR.  (*Id.* ¶¶ 21, 24.)

Plaintiff alleges that inmates who, like him, are given an ICR classification ("ICR inmates") are issued green identification cards and are subject to invasive searches of their persons and cells at all hours of the day and night, including strip searches.  (*Id.* ¶¶ 21, 37-39.)  In addition, immediate family members who visit ICR inmates are subject to more rigorous searches of their persons and possessions.  (*Id.* ¶ 43.)

Plaintiff asserts that, when he returned to Rikers in 2007, he complained about his ICR classification to a DOC employee and was subsequently issued a regular identification card that did not indicate an ICR classification.  (*Id.* ¶ 28.)  Despite this, Plaintiff claims that his DOC records were never modified to reflect the removal of his ICR classification.  (*Id.* ¶ 29.)  On April 27, 2010, when Plaintiff again returned to Rikers (to GRVC), for his most recent period of detention, he alleges that defendant Correction Officer Williams ("Williams") issued him a green identification card, indicating, once again, that Plaintiff was classified as ICR.  (*Id.* ¶ 30.)

Plaintiff alleges that he again complained about his ICR classification, and Williams directed him to appeal his objection regarding the renewed classification in writing to the warden of GRVC, so, on July 29, 2010, Plaintiff appealed to the then-acting warden, who was either defendant Warden Edmund Duffy ("Duffy") or defendant Warden Kathleen Mulvey ("Mulvey"). (*Id.* ¶¶ 31-32.)  Plaintiff states that he never received a response from either warden, so he was later instructed by defendants Captain Albert Butler ("Butler") and Captain Darnell Negron ("Negron") to submit another appeal, which he did, on August 17, 2010.  (*Id.* ¶¶ 33-34.)

Plaintiff alleges that he did not receive a written response to this appeal either (*id.* ¶¶ 33, 35), but that defendant Correction Officer Kinloch ("Kinloch") informed Plaintiff that his ICR classification would be removed (*id.* ¶ 35).  Plaintiff alleges that, on each of these occasions, although Butler, Negron, and Kinloch all assured him that his classification would be removed, the classification was not removed (*id.* ¶¶ 33-36).  On May 2, 2011, Butler allegedly told Plaintiff that the infraction that had given rise to his ICR classification 10 years earlier had been previously investigated and dismissed.  (*Id.* ¶ 36.)  According to Plaintiff, Butler told him that his ICR classification had been "void from day one."  (*Id.*)

Plaintiff claims that, despite these assurances from various DOC employees, he continued to be classified as ICR.  (*Id.* ¶ 37.)  As a result, he was allegedly subjected to "baseless and highly invasive searches" of his cell at all hours of the day and night.  (*Id.*)  Plaintiff claims that, during these searches, he was forcibly removed from his cell, "subjected to physical aggression" by the DOC officers, and often subjected to "humiliating searches of [his] person, including strip searches."  (*Id.* ¶¶ 38-39.)  Plaintiff contends that these searches caused him "physical harm" and damage to his personal possessions, including legal documents.  (*Id.* ¶ 38.)[2]  Plaintiff also complains that, as a result of his ICR classification, his family members were subjected to heightened security precautions when they visited him, including "hand scanning" by correction officers and searches by aggressive dogs, and, as a result, his family stopped visiting him.  (*Id.* ¶¶ 43-44.)  Plaintiff alleges that, by dissuading his family from visiting him,

---

[2] Plaintiff also alleges that, on one occasion, DOC officers attempted to plant contraband in his cell, but he provides no details regarding this incident or the identity of the officers.  (*Id.* ¶ 40.)

and by causing him to be subject to invasive searches, at unpredictable times, his ICR mis-classification has caused him serious emotional harm.  (*Id.* ¶¶ 41, 44.)

### 2.   SRG Classification

According to the Third Amended Complaint, Plaintiff has never had ties to any gangs, has never received visits or correspondence from gang members, has not been charged with any gang-related offenses, and has no gang-related markings on his body.  (*Id.* ¶¶ 48-53.) Notwithstanding this alleged lack of any gang connection, Plaintiff pleads that, in 2000, he was also given an SRG classification, because of the alleged mistaken belief by DOC employees that Plaintiff was a member of the "Bloods" gang.  (*Id.* ¶ 45.)  Plaintiff's classification as a gang member and SRG status remained during every one of his detentions at Rikers, including his most recent detention, which commenced in 2010.  (*Id.* ¶ 54.)

According to Plaintiff, once DOC officials make a determination that an inmate is connected to a particular gang, that information is recorded and disseminated to other DOC employees at various Rikers facilities.  (*Id.* ¶ 62.)  Plaintiff asserts that inmates given an SRG classification are treated more harshly than other inmates at Rikers, insofar as they are housed in isolation, subjected to more stringent rules and regulations relating to their movements within the facilities, and deprived of many privileges afforded to general-population inmates.  (*Id.* ¶ 46.) Plaintiff also contends that SRG status is used as a pretense for DOC employees to use physical force against inmates.  (*Id.* ¶ 47.)  Inmates with an SRG classification have also been included on a list, known to Plaintiff as the "Alpha Sheet," which identifies the name and alleged gang affiliation of every inmate in a particular DOC facility.  (*Id.* ¶¶ 63-64.)  This sheet, according to Plaintiff, has been prominently displayed in the Commanding Officer's station in the jail units in which Plaintiff has been detained, and has been viewable by other inmates.  (*Id.* ¶¶ 65-68.)

Plaintiff alleges that, beginning in 2000, he made repeated attempts to have his SRG/gang member classification removed.  (*Id.* ¶¶ 55, 69.)  Plaintiff asserts that he asked many DOC employees how to have the SRG classification removed and was turned away by employees of the Grievance Departments at both OBCC and GRVC.  (*Id.* ¶ 56, 69.)

On or about May 7, 2011, Plaintiff allegedly discussed his SRG classification with defendant Correction Officer Anton Taylor ("Taylor").  (*Id.* ¶ 57.)  According to Plaintiff, Taylor informed him, at that time, that Plaintiff was no longer classified as a member of the Bloods gang, but rather had been classified as a member of the "Patria" or "Trinidadio" gang.[3]  (*Id.*)  Taylor allegedly told Plaintiff that his classification as a member of the Patria or Trinidadio gang was because of "DOC's observations that Plaintiff was both a practicing Catholic and of Dominican descent."  (*Id.*)  Plaintiff states that he responded to Taylor by reiterating that he had never been a member of any gang, including the Patria or Trinidadio gang.  (*Id.* ¶ 58.)  Plaintiff was, however, of Dominican origin, and, at that point, a practicing Catholic.  (*Id.*)

Plaintiff claims that, once he learned that his religious practice was one of the reasons for his SRG classification, he came to believe that any continued expression of his religious beliefs would result in his continued mis-classification as a gang member, with SRG status.  (*Id.* ¶¶ 59, 101, 111.)  Plaintiff therefore asked the DOC to remove the Catholic affiliation from his identity card, which, in contrast to his requests regarding his SRG classification, DOC did immediately, and Plaintiff stopped attending Catholic Mass.  (*Id.* ¶¶ 59, 101, 111.)  In addition, Plaintiff alleges that, because he learned that DOC employees were confiscating Bibles that they believed

---

[3] Although Plaintiff generally spells the name of this gang as "Trinidadio," and thus the Court will do the same here, the Court takes judicial notice of the fact that the gang presumably being referred to by Plaintiff is commonly known as the "Trinitario" or "Trinitarios."  *See, e.g.*, *U.S. v. Taveras*, 585 F. Supp. 2d 327 (E.D.N.Y. 2008) (discussing "Trinitarios" gang).

6

were being used by gang members to exchange messages, he felt pressured to send his personal

Bible – the only Bible he had access to in his cell – to his family, out of fear that keeping it

would draw unjustified harassment from DOC employees.  (*Id*. ¶ 60.)  Plaintiff also states that he

felt pressured to give up his Bible because he came to believe that his mere possession of a

Bible, like his attendance at Mass, would "give rise to an inference that he was a gang member."

(*Id*. ¶¶ 101, 111.)  Plaintiff claims that these pressures to curtail his religious expression

impermissibly burdened his free exercise of his religion.  (*See, e.g.*, *id*. ¶¶ 61, 101, 103, 111.)

Plaintiff alleges that he suffered physical and emotional pain from the generally rough

treatment by DOC employees and the regular isolation from other inmates to which he was

subjected, as a result of his SRG mis-classification.  (*Id*. ¶ 61.)  Plaintiff also contends that he

was routinely taunted, intimidated, and threatened with physical violence by gang members and

that he constantly feared for his safety.  (*Id*. ¶ 68.)  Having allegedly been told that his SRG

classification was "non-grievable," Plaintiff states that his SRG classification, as well as his ICR

classification, remained in place, as of the date of his filing of the Third Amended Complaint.

(*Id*. ¶ 69.)

### B.    Procedural History

On July 12, 2011, Plaintiff filed his original *pro se* Complaint, alleging injuries related to

his ongoing ICR and SRG mis-classification while a pretrial detainee at Rikers.  (Dkt. 2.)  On

February 10, 2012, this Court granted Plaintiff's application for the Court to request *pro bono*

counsel to represent him in this action, and, shortly thereafter, Plaintiff's current counsel

accepted the representation and appeared on his behalf.  (Dkts. 18, 23, 24.)  With the assistance

of counsel, Plaintiff filed a Second Amended Complaint on May 1, 2012 (Dkt. 33) and a Third

Amended Complaint on July 27, 2012 (Dkt. 37).

The Third Amended Complaint contains a number of claims.  Counts I through IV assert claims under Section 1983 for 14th Amendment due-process violations relating to Plaintiff's alleged mis-classifications as ICR and SRG; Counts V and VI assert Section 1983 claims for violations of Plaintiff's First Amendment right to the free exercise of his religion; Counts VII and VIII assert Section 1983 claims for RLUIPA violations; and Counts IX and X assert state-law negligence claims, including a claim against the City for the negligent failure to train and supervise DOC employees.  (*See generally* 3d Am. Compl.)

On September 24, 2012, Defendants moved to dismiss all of the claims pleaded in Plaintiff's Third Amended Complaint.  (Dkt. 45.)  As to Plaintiff's federal claims, Defendants sought dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that Plaintiff had failed to plead facts sufficient to state a federal claim.  (*See id*.)  Defendants sought dismissal of Plaintiff's pendent state-law claims under Rule 12(b)(1), for lack of subject-matter jurisdiction.  (*See id*.)   In their motion, Defendants primarily argue that:  (1) the majority of Plaintiff's claims are time-barred, (2) Plaintiff's 14th Amendment due-process claims fail because Plaintiff has not sufficiently alleged the deprivation of any constitutionally protected liberty interest, and because he has failed to state a constitutional claim for deliberate indifference to his safety; (3) Plaintiff's First Amendment and RLUIPA claims fail because he has not alleged that Defendants substantially burdened his religious exercise; (4) the Individual Defendants are entitled to qualified immunity; (5) Plaintiff has failed to allege facts sufficient to state a constitutional claim for municipal liability; (6) Plaintiff is not entitled to compensatory relief under the Prison Litigation Reform Act ("PLRA"); and (7) the Court should decline to exercise supplemental jurisdiction over Plaintiff's state-law claims.  (*See generally*

Memorandum of Law in Support of Motion to Dismiss, dated Sept. 24, 2012 (Dkt. 46)

("Def. Mem.").)

On October 23, 2012, Plaintiff filed a memorandum in opposition to Defendants' motion

to dismiss, contending that his claims are not time-barred, that the Third Amended Complaint

contains sufficient facts to support his federal claims against all Defendants, as well as his

requested relief of compensatory damages, and that the Court should exercise supplemental

jurisdiction over his state-law claims.  (*See* Memorandum of Law in Opposition to Motion to

Dismiss, dated Oct. 23, 2012 (Dkt. 47) ("Pl. Mem.").)  On November 11, 2012, Defendants filed

a reply memorandum in further support of their motion.  (*See* Reply Memorandum of Law in

Support of Motion to Dismiss, dated Nov. 11, 2012 (Dkt. 49) ("Def. Reply Mem.").)

## DISCUSSION

## I.    APPLICABLE LEGAL STANDARDS

In deciding a Rule 12(b)(6) motion, the Court "accept[s] as true all factual statements

alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party."

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted);

*accord Jaghory v. New York State Dep't of Ed.*, 131 F.3d 326, 329 (2d Cir. 1997).  At the same

time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not

suffice to defeat a motion to dismiss."  *Achtman v. Kirby, McInerney & Squire, LLP*,

464 F.3d 328, 337 (2d Cir. 2006) (citation omitted).  To survive a motion to dismiss, a complaint

must "state[ ] a plausible claim for relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see*

*generally Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Starr v. Sony BMG Music Entm't*,

592 F.3d 314, 321 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 677).  In resolving a Rule 12(b)(1) motion, however, the Court may consider evidence outside the pleadings, if necessary to determine whether the Court lacks subject-matter jurisdiction over the plaintiff's claims.  *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (*citing Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)).

## II.    DEFENDANTS' MOTION TO DISMISS

### A.    Statute of Limitations

 As a threshold matter, the Court addresses Defendants' contention that some or all of Plaintiff's constitutional claims are time-barred.  In considering Section 1983 claims, courts should apply "the general or residual [state] statute [of limitations] for personal injury actions." *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989) (alteration in original)); *see also Wallace v. Kato*, 549 U.S. 384, 387 (2007).  Accordingly, "New York's three-year statute of limitations for unspecified personal injury actions, New York Civil Practice Law and Rules § 214(5), governs Section 1983 actions in New York." *Ormiston*, 117 F.3d at 71.  Plaintiff's initial *pro se* Complaint was filed with the Court on July 12, 2011, meaning that, absent evidence of a "continuing violation" or tolling of the statute of limitations, Plaintiff would be barred from bringing any constitutional claim arising from conduct that occurred before July 12, 2008.

Plaintiff does not assert that claims arising before July 12, 2008, should be allowed under a continuing-violation or equitable-tolling doctrine.  Instead, conceding that the three-year limit is applicable, Plaintiff asserts that he is seeking redress *only* for injuries occurring after April 2010, which was the commencement of his most recent period of detention at Rikers.  (Pl. Mem., at 12.)  Given this clarification by Plaintiff as to the limited scope of his claims, this Court

recommends that the claims be construed accordingly, and that Defendants' motion for dismissal on statute-of-limitations grounds be denied.[4]

B.    **Challenges to Plaintiff's Federal Claims**

1.    **Adequacy of Due Process Claims**

In his Third Amended Complaint, Plaintiff variously asserts against all Defendants, in four separate counts (Counts I-IV), due-process claims under 42 U.S.C. § 1983 and the 14th Amendment for injuries that Plaintiff allegedly suffered as a result of his ICR and SRG classifications.  (*See* 3d Am. Compl. Counts I-IV.)  In each of these counts, Plaintiff alleges, identically, that the actions of Defendants constituted "illegal punishment of Plaintiff, thereby denying him the due process of law in violation of the Fourteenth Amendment."  (*Id.* ¶¶ 73, 80, 86, 93.)  Although his choice of words does not make this clear, Plaintiff's allegations suggest that he may be attempting to raise two types of due-process claims.  First, Plaintiff could be making a claim that, as a pretrial detainee, he had a liberty interest (protectable under the Due Process Clause) in being free from unlawful "punishment," and that his ICR and SRG classifications constituted such punishment.  Second, Plaintiff could be making a deliberate-indifference claim (which, for pretrial detainees, would be brought under the 14th Amendment, but subject to Eighth Amendment standards), alleging that Defendants were deliberately indifferent to the fact that Plaintiff's ICR and SRG classifications exposed him to a substantial

_____

[4] It bears noting, though, that, while allegations of events occurring before July 12, 2008 may not form the basis of a constitutional claim, the Court may still consider those allegations as "background evidence," insofar as they increase the plausibility of Plaintiff's timely allegations. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Shah v. MTA New York City Transit*, No. 12 CV 4276 (ERK) (RLM), 2013 WL 504387, at *6 (E.D.N.Y. Feb. 8, 2013); *Meyers v. Medco Health Solutions, Inc.*, No. 09 Civ. 09216 (RKE), 2012 WL 4747173, at *5 (S.D.N.Y. Oct. 4, 2012).

risk that other inmates would cause him serious harm.  Defendants argue that both types of due-process claims should be dismissed.  In his brief, Plaintiff seems to suggest that he is only seeking to pursue a deliberate-indifference claim, but, for the sake of thoroughness (and because Plaintiff's opposition papers, like his pleading, are not entirely clear), this Court will address whether Plaintiff's allegations are sufficient to state either type of claim.

     **a.**     <u>**Allegedly Punitive Nature of Classification**</u>

Defendants argue that Plaintiff did not have a liberty interest in being free of his SRG and ICR classifications, and therefore cannot state a due-process claim relating to any violation of such an interest.  Plaintiff seems to concede that he had no liberty interest in his administrative status, but still contends that Defendants' conduct violated his "constitutional right, as a pre-trial detainee, to be free from unlawful punishment without due process of law." (Pl. Mem., at 1.)  For the reasons discussed below, this Court finds that Plaintiff had no liberty interest in being free from this challenged classifications, for the very reason that they were not "punitive" in nature.

"It is well established that in order to state a claim under § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States." *Eagleston v. Guido*, 41 F.3d 865, 876 (2d Cir. 1994) (citations and internal quotation marks omitted).  Section 1983 itself creates no substantive rights, but rather provides only a procedure for redress for the deprivation of rights established elsewhere.  *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985) (citation omitted). The right that Plaintiff claims has been violated here is the right to due process under the 14th Amendment.

12

Pursuant to the Due Process Clause of the 14th Amendment, "[n]o State shall . . .
deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend.
XIV.  A constitutionally protected "[l]iberty interest may arise from two sources – the Due
Process Clause itself and the laws of the States."  *Hewitt v. Helms*, 459 U.S. 460, 466 (1983).  To
prevail on a due-process claim, a plaintiff must establish that he "(1) he possessed a liberty
interest, and (2) that the defendants deprived him of that interest as a result of insufficient
process."  *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (quoting *Giano v. Selsky*, 238 F.3d
223, 225 (2d Cir. 2001)).

Given that the 14th Amendment protects an individual's liberty interest in avoiding
punishment before the legal adjudication of guilt, a pretrial detainee has a liberty interest,
protectable under the Due Process Clause, where "conditions amount to punishment of the
detainee."  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also McFadden v. Solfaro*, Nos. 95
Civ. 1148 (LBS), 95 Civ. 3790 (LBS), 1998 WL 199923, at *4 (S.D.N.Y. April 23, 1998).  With
respect to what types of conditions amount to punishment, the Supreme Court has explained:

> Not every disability imposed during pretrial detention amounts to
> 'punishment' in the constitutional sense . . . .
>
> * * *
>
>  . . . Absent a showing of an expressed intent to punish on the part
> of detention facility officials, that determination generally will turn
> on whether an alternative purpose to which [the restriction] may
> rationally be connected is assignable for it, and whether it appears
> excessive in relation to the alternative purpose assigned [to it].
> Thus, if a particular condition or restriction of pretrial detention is
> reasonably related to a legitimate governmental objective, it does
> not, without more, amount to punishment.

*Id.* at 535, 538 (alterations in original) (citation and internal quotation marks omitted).  When
determining if prison administrators' actions were motivated by a legitimate government object,

13

courts should accord "wide-ranging deference [to prison officials] in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Id.* at 547.

In *Covino v. Vermont Department of Corrections*, 933 F.2d 128 (2d Cir. 1991), a case involving a pretrial detainee, the Second Circuit noted the general principle that "'[t]he transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is not a right protected by the due process clause itself'" *id.* at 129 (quoting *Hewitt*, 459 U.S. at 468). Accordingly, a number of courts in this district have concluded that administrative classifications of pretrial detainees, even where the classifications come with restrictive conditions, do not give rise to a liberty interest, absent evidence of an intent to punish.[5]  *See Palacio v. Ocasio*, No. 02 Civ. 6726 (PAC) (JCF), 2006 WL 2372250, at *8-9 (S.D.N.Y. Aug. 11, 2006) (finding that

---

[5] Although Defendants argue that it is well settled that an administrative classification alone does not give rise to a protected liberty interest under the Due Process Clause, some of the cases on which Defendants rely for this proposition address the due-process rights of convicted prisoners, not pretrial detainees, and thus have limited applicability here.  (*See* Def. Mem., at 6 (citing, *e.g.*, *Pugliese v. Nelson*, 617 F.2d 916, 923 (2d Cir. 1980) (holding that particular administrative classification of convicted prisoner did not entitle the prisoner to due-process protections).)  Essentially, to show a liberty interest, convicted prisoners must satisfy a stringent "atypical and significant hardship" standard, as outlined in *Sandin v. Conner*, 515 U.S. 472 (1995), whereas pretrial detainees need not meet such a standard because "[a] detainee's interest in freedom from unjustified infliction of pain and injury is more substantial."  *Lewis v. Amato*, No. 12 Civ. 607, 2013 WL 3387078, at *8 (N.D.N.Y. July 8, 2013) (quoting *Sandin*, 515 U.S. at 188-90).  Although, in either situation, an inmate's administrative classification may or may not give rise to a liberty interest, *see, e.g.*, *Adams v. Galleta*, No. 96 Civ. 3750 (JGK), 1999 WL 959368, at *4 (S.D.N.Y. Oct. 19, 1999) (holding that pretrial detainee's administrative designation did not give rise to a liberty interest); *Green v. City of New York*, No. 06 Civ. 4978 (LTS) (KNF), 2008 WL 2485402, at *5 (S.D.N.Y. June 19, 2008) (finding that convicted prisoner, who had faced death threats from other inmates, had pleaded the plausible existence of a liberty interest), the Court must be cognizant of the fact that these different contexts require the application of different legal standards.

pretrial detainee did not have liberty interest in remaining free of CMC[6] status), *aff'd sub nom.*

*Palacio v. Pagan*, 345 Fed. App'x 668 (2d Cir. 2009); *Adams*, 1999 WL 959368, at *4

(determining that pretrial detainee's CMC designation and maximum security housing was not

punitive where there was no evidence of punitive intent and the records reflected that it was

imposed because of plaintiff's possible escape status); *McFadden*, 1998 WL 199923, at *8

(finding that confinement of a pretrial detainee to segregation based on a security classification

was not punitive).  While the cases cited above were decided at the summary judgment stage, a

due-process challenge to a detainee's administrative classification may also be dismissed under

Rule 12(b)(6), where the plaintiff has alleged no intent to punish and no consequences of the

classification that could be considered punitive in nature.

In this instance, any due-process claim that Plaintiff may be attempting to assert based on

the "punitive" nature of his ICR and SRG classifications should be dismissed.  Plaintiff – who

himself characterizes these classifications as "administrative" (Pl. Mem., at 1) – has not alleged

that either classification was imposed with an "expressed intent to punish"; to the contrary, he

specifically pleads that his ICR classification was imposed because of his alleged status as a

recipient of narcotics, and that his SRG classification was imposed because of Plaintiff's

suspected affiliation with the Bloods gang, and then later with the Patria/Trinidadio gang (*see*

3d Am. Compl. ¶¶ 21, 24, 45, 57).  Taking these allegations as true, it is plain that both

classifications fall within the category of non-punitive administrative classifications that are

"used to separate potentially disruptive groups of inmates."  *Walker v. Shaw*, No. 08 Civ. 10043

---

[6] A CMC classification is assigned to inmates who "present special needs for management," such as those who are "disruptive or assaultive, and those who should for one reason or another be separated from others or housed in particular facilities."  *Pugliese*, 617 F.2d at 918.

(CM), 2010 WL 2541711, at *4 (S.D.N.Y. June 23, 2010) (discussing the SRG classification); *see also Silber v. Pallito*, No. 1:09-CV-73, 2011 WL 1225594, at *7 (D. Vt Feb. 7, 2011) (noting that "[n]on-punitive classification decisions are often referred to as 'administrative'"), *report and recommendation adopted as modified by* 2011 WL 1225588 (D. Vt. Mar 31, 2011).

In addition, Plaintiff nowhere suggests, in his pleading, that the general rationale for ICR and SRG classifications, and their associated more restrictive conditions, is not reasonably related to legitimate government objectives. Nor could Plaintiff plausibly make such a claim. As the Supreme Court has recognized, "the government has legitimate interests that stem from its need to manage the facility in which the individual is detained," and those legitimate interests include taking steps to "maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees." *See Bell*, 441 U.S. at 540; *see also McFadden*, 1998 WL 199923, at *8.

Finally, Plaintiff has failed to allege facts sufficient to give rise to a plausible inference that the conditions associated with his classifications were excessive in relation to the legitimate government interests. The alleged conditions of his detention that Plaintiff describes in the Third Amended Complaint are a far cry from the extreme conditions at issue in cases where, notwithstanding the deference normally accorded to prison officials' determination of a legitimate government interest, courts have required prison officials to demonstrate that a legitimate non-punitive interest motivated their actions. Most typically, such conditions have involved extended solitary, or extremely restrictive, confinement. *See, e.g., Covino*, 933 F.2d at 130 (remanding for consideration whether confining pretrial detainee in prison's isolation wing for nine months constituted punishment); *Lewis*, 2013 WL 3387078, at *11 (finding placement of pretrial detainee in 23-hour a day lock-up, for 140 days, "in an environment generally

16

reserved for those guilty of punitive infractions and subject to punitive confinement" sufficient to give rise to a liberty interest); *DeLeon v. Rockland Cnty.*, No. 10 Civ. 7536 (PGG), 2013 WL 1195623, at *7-8 (S.D.N.Y. Mar. 22, 2013) (finding issue of fact as to whether 199 days in solitary confinement raised liberty interest protected under Due Process Clause).

The treatment to which Plaintiff was allegedly subjected as a result of his ICR and SRG classifications did not similarly "smack[] of punishment." *Covino*, 933 F.2d at 130. Plaintiff alleges that, as a result of his ICR and SRG classifications, he and his visiting family members were made subject to invasive searches (*see* 3d Am. Compl. ¶¶ 37-39), generally rough treatment (*see, e.g.*, *id.* ¶ 61), and what he describes as "regular isolation from other inmates" (*id.*), which the Court does not understand to mean solitary confinement, but rather confinement among others who were similarly classified, in an area that was segregated from the general population (*see id.* ¶ 46 (alleging that "*SRG inmates* are housed in isolation") (emphasis added)).[7] Even if Plaintiff's allegations are accepted as true, it appears that, at most, he has alleged that inmates who were given ICR and SRG classifications faced conditions that were more harsh than those faced by other inmates, but he has not adequately alleged that these harsher conditions were of the type "generally reserved for those subject to punitive infractions." *Lewis*, 2013 WL 3387078, at *11. He has thus failed to allege that his ICR and SRG classifications gave rise to a liberty interest under the Due Process Clause.

---

[7] If this Court has misconstrued Plaintiff's allegations in this regard, and he was actually subjected to extended periods of solitary confinement or other punitive segregation, then Plaintiff may wish to explain this in objections to this Report and Recommendation filed pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b)(2) of the Federal Rules of Civil Procedure.

As Plaintiff has not pleaded facts sufficient to give rise to a liberty interest in remaining free of the administrative classifications,[8] he had no constitutional right to due process before receiving the classifications, nor did he have a due-process right to appeal his classifications, after receiving them, *Walker*, 2010 WL 2541711, at *5, and any such due-process claims should be dismissed.

> **b.**      **Alleged Deliberate Indifference to Plaintiff's Safety**

Plaintiff argues that Defendants violated his rights under the 14th Amendment by exhibiting deliberate indifference to his risk of being subjected to violence from other inmates as a result of his ICR and SRG mis-classifications (*see* Pl. Mem., at 7-9), but Plaintiff's allegations supporting this claim are insufficient, as well.

Where a "deliberate indifference" claim is brought by a prisoner who has already been convicted of a crime, the Court will analyze that claim under the Eighth Amendment, as the prisoner is seeking to vindicate that Amendment's prohibition against "cruel and unusual punishment." *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009). In contrast, a claim that a prison official has acted with deliberate indifference to the health or safety of a pretrial detainee is properly analyzed under the 14th Amendment (where the detainee is held in state custody) or under the Fifth Amendment (where the detainee is held in federal custody) because, as a pretrial detainee, the plaintiff "is not being punished." *Id*. (citation and internal quotation marks

---

[8] While Plaintiff does not try to argue that any state regulations governing inmate classifications create a liberty interest, it is worth noting that this argument has been addressed and rejected by several courts in this district. *See Walker*, 2010 WL 2541711, at *5-6; *Adams*, 1999 WL 959368, at *5-6; *Korkala v. NYC Dept of Corr.*, No. 84 Civ. 5740, 1986 WL 9798, at *4-5 (S.D.N.Y. Sept. 4, 1986).

18

omitted).  Notwithstanding this procedural distinction, these types of claims are typically analyzed using an identical standard.  *See id.* at 72.

Accordingly, although Plaintiff in this case is a pretrial detainee, the Court will consider Eighth Amendment precedent to analyze his deliberate-indifference claim.  Such precedent makes clear that the Constitution imposes, on prison officials, a duty to "provide humane conditions of confinement," and, therefore, to "take reasonable measures to guarantee the safety of the inmates . . . . [including] to protect prisoners from violence at the hands of other prisoners."  *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (citations and internal quotation marks omitted).  The Supreme Court has cautioned, however, that "[i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  *Id.* at 834.  Rather, a prison official will only be held liable for harm caused to an inmate by the hand of another inmate where the official acted with "deliberate indifference" to the victim's safety, *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996), and, to meet this standard, a plaintiff must satisfy both objective and subjective criteria.

First, the alleged deprivation of the plaintiff's constitutional rights must be "objectively, sufficiently serious," which, in failure-to-prevent-harm cases, means that the plaintiff must demonstrate that he was subjected to conditions "posing a substantial risk of serious harm."  *Farmer*, 511 U.S. at 834; *see also Hayes*, 84. F.3d at 620.  Second, the plaintiff must show that, subjectively, the prison official "had knowledge that [the plaintiff] face[d] a substantial risk of serious harm" and "disregard[ed] that risk by failing to take reasonable measures to abate the harm."  *Hayes*, 84 F.3d at 620.  To state an adequate claim for relief, the plaintiff must allege facts sufficient to support both the objective and subjective prongs of the analysis.

19

In this case, Plaintiff has not pleaded facts capable of satisfying the initial, objective prong of the deliberate-indifference standard, and thus the Court's analysis need go no further. With respect to this initial prong of the analysis, courts have consistently required plaintiffs in inmate-safety cases to allege that they either suffered a physical injury or were subject to an imminent threat of serious physical injury in circumstances making the threat plausible. *See, e.g., Green v. City of New York Dep't of Corr.*, No. 06 Civ. 4978 (LTS) (KNF), 2008 WL 2485402, at *6 (S.D.N.Y. June 19, 2008) (finding that "death threats alleged by Plaintiff . . . without any allegation that physical harm actually existed or was imminent . . . [or] that any inmate perceived to be [a member of the same gang] was physically harmed, do not render plausible Plaintiff's claim that he was subject to *a substantial risk of serious harm*) (emphasis in the original); *Chalif v. Spitzer*, No. 9:05-CV-1355 (LEK/DEP), 2008 WL 1848650, at *9 (N.D.N.Y. Apr. 23, 2008) (finding no substantial risk of serious harm where plaintiff alleged that he was "subjected to psychological torture by imminent threat of death" but complaint did not include "any incident whereby he was assaulted by any fellow inmates, or that such an assault was threatened and imminent"); *Richardson v. Castro*, No. 97-CV-3772 (SJ), 1998 WL 205414, at *5 (E.D.N.Y. Apr. 24, 1998) ("[V]erbal threats do not violate the constitution unless accompanied by physical force or the present ability to effectuate the threat.") (citation and internal quotation marks omitted). Here, Plaintiff has alleged neither actual physical injury nor an imminent threat of serious physical injury.

Certainly, Plaintiff has not alleged that he suffered any physical harm at the hands of other inmates or, for that matter, as a result of any dangerous conditions of his confinement.[9]

---

[9] Although Plaintiff alleges that certain of the Individual Defendants were deliberately indifferent to the actual physical harm that he suffered from being strip-searched, physically

Plaintiff has also failed to allege sufficiently, under the applicable standard, that he has been subject to any threats of imminent physical harm by other inmates.  Plaintiff does allege that, as a result of Defendants' disclosure of his classification as a member of the Patria or Trinidadio gang, he was "routinely taunted, intimidated, and threatened with physical violence by members of opposing gangs," causing him to fear for his safety (3d Am. Compl. ¶ 68), but the Third Amended Complaint contains no concrete allegations regarding the circumstances or exact nature of any alleged threat made to Plaintiff (*see id.*).  More importantly, Plaintiff has not alleged facts suggesting that any threatened harm that he faced was *imminent*.  Plaintiff does not, for example, allege that any member of the Patria or Trinadadio gang had been recently attacked by members of a rival gang and thus suffered actual, serious physical harm because of his reported status as a gang member.  *Cf. Walker*, 2010 WL 2541711, at *9.

In this regard, Plaintiff's allegations are wholly unlike those in *Walker*, the only case Plaintiff invokes as factually supporting his deliberate-indifference claim.  (*See* Pl. Mem., at 7-9 (citing *Walker*, 2010 WL 2541711).)  In *Walker*, the plaintiff, a pretrial detainee at Rikers, was allegedly mis-classified as a member of the "Bloods" gang, while he was housed in a correctional unit with a history of deadly violence between the "Bloods" and the "Crips."  2010 WL 2541711, at *1.  In finding that the plaintiff had sufficiently pleaded the existence of a "substantial risk of serious harm," the court noted that he had not only alleged a specific threat of violence against him, but also a recent killing of a Crips inmate under similar circumstances, and

---

intimidated, and abused *by other correctional officers* during searches conducted as a result of his ongoing ICR mis-classification (*see* 3d Am. Compl. ¶¶ 38, 39, 41, 61; *see also* Pl. Mem., at 7-8), claims for physical harm at the hands of a correctional officer – or for an officer's failure to intervene to prevent such harm – are not properly brought as deliberate-indifference claims, but rather as excessive-force claims, which Plaintiff is clearly not asserting in this action.

21

a policy by the prison to separate the two gangs in separate cell blocks.  *See id*. at *9-10.  These allegations, taken together, were sufficient to plead that the threat to the plaintiff's safety was "real and significant."  *Id*. at *10.  In contrast, Plaintiff's allegations in this case fail to identify either a specific threat or any facts rendering it likely that Plaintiff would be subject to imminent, physical harm.  Indeed, Plaintiff's allegations are even less specific than those found to be insufficient in *Green*, which addressed a similar claim by a Rikers inmate who was allegedly erroneously classified with an SRG status and then threatened by rival gang members.  *See Green*, 2008 WL 2485402, at *2, *6 (holding that plaintiff failed to state a plausible claim that he was subject to a substantial risk of serious harm posed by an erroneous SRG classification, notwithstanding allegations that he received regular death threats and "life threatening gestures" from members of opposing gangs).

Finally, Plaintiff's allegations that he has suffered emotional harm, both from having to anticipate "when the next humiliating . . . . baseless and highly invasive searches" of his person would occur (3d Am. Compl. ¶¶ 41-42), and from the loss of family visits that resulted from family members themselves being subjected to invasive searches (*id*. ¶¶ 43-44), are also insufficient to state a plausible deliberate-indifference claim.  Neither of these allegations relate, in any way, to any actual or threatened harm to Plaintiff's safety posed by other inmates.  In any event, Plaintiff's only allegations of emotional harm do not plausibly rise to the level of the type of "extreme" psychological harm that would be a necessary component of a deliberate-indifference claim.  *See Walker*, 2010 WL 2541711, at *9.

As Plaintiff has not plausibly stated a due-process or deliberate-indifference claim, I recommend that Defendant's motion to dismiss each of Plaintiff's 14th Amendments claims (Counts I through IV of the Third Amended Complaint) be granted.

### 2.      Adequacy of Plaintiff's First Amendment and RLUIPA Claims

Invoking both the federal Constitution (under the First Amendment,[10] as applied through the 14th Amendment) and RLUIPA,[11] Plaintiff alleges that the City, by acting through the DOC to label him a gang member based on the practice of his Catholic religion, and Taylor, by then informing him of this, effectively pressured him to abandon the open practice of his faith (including going to Mass and keeping a personal Bible) and thereby violated his right to the free exercise of his religion.  In moving to dismiss these claims, Defendants argue (a) that Plaintiff's pleading is substantively inadequate to state a claim for impingement of his religious liberty, (b) that Plaintiff has failed to allege sufficient personal involvement by Taylor to render him liable for the claimed violations, (c) that Taylor, in any event, has qualified immunity from suit on these claims, (d) that Plaintiff cannot state a claim against the City for municipal liability, and (e) that Plaintiff's claims for compensatory damages are barred under the PLRA.  The Court will address each of these arguments in turn.

### a.      Adequacy of Allegations That Plaintiff's Religious Exercise Was Substantially Burdened

To state a claim under both the Free Exercise Clause of the First Amendment and RLUIPA, an inmate must first allege that the government imposed a "substantial burden" on his religious exercise.  *See Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006) (to state a free

---

[10] The Free Exercise Clause of the First Amendment states:  "Congress shall make no law . . . prohibiting the free exercise [of religion]."

[11] Section 2000cc-1(a) of RLUIPA states:  "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).

exercise claim under the First Amendment, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs"); *id.* at 273 (Under RLUIPA, "a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates." (quoting 42 U.S.C. § 2000cc-1(a))).

Ultimately, after a plaintiff shows that defendants have substantially burdened his religious exercise, the Court's analysis of a First Amendment claim and a RLUIPA claim will diverge. To prevail on a First Amendment claim, a plaintiff must also show that his religious belief is "sincerely held," *Salahuddin*, 467 F.3d at 274-75 (quoting *Ford v. McGinnis*, 352 F.3d 582, 591 (2d Cir. 2003)); "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct," although "'the burden remains with the prisoner to show that these articulated concerns were irrational'" *id.* Under RLUIPA, however, the defendants bear the heavier burden of demonstrating that their challenged conduct "(1) [was] in furtherance of a *compelling* governmental interest; and (2) [was] the *least restrictive* means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a) (emphases added).

At this stage of the litigation, where Defendants have challenged, under Rule 12(b)(6), Plaintiff's pleading of his religious-liberty claims, the Court need not address the question of whether Plaintiff actually had a sincere belief in his Catholic faith, or whether the City and Taylor may be able to make an adequate showing of a "legitimate penological interest" for their alleged conduct. Rather, the Court need only consider Defendants' contention that, on its face, the Third Amended Complaint does not sufficiently plead that the City and Taylor imposed a "substantial burden" on Plaintiff's exercise of his Catholic religion.

The Second Circuit has assumed that, by using the term "substantial burden" in RLUIPA, Congress intended "to incorporate the cluster of ideas associated with the [Supreme] Court's use of it" in the First Amendment context. *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (collecting cases). Thus, in both contexts, a substantial burden on religious exercise exists "when a[n inmate] is required to 'choose between following the precepts of her religion and forfeiting benefits on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.'" *Id.*; *see also Simmons v. Robison*, No. 07 Civ. 7383 (DAB) (DFE), 2010 WL 5538412, at *11 (S.D.N.Y. Jan. 28, 2010 ), *report and recommendation adopted by* 2011 WL 31066 (S.D.N.Y. Jan. 4, 2011). In other words, a "substantial burden" does not have to involve the prohibition of religious practice (as in, for example, prohibiting attendance at a religious service). Rather, coercive conduct that, directly or indirectly, tends to force the individual to restrict the practice of his religion may well be sufficient. *See, e.g.*, *Westchester Day Sch.*, 504 F.3d at 348 (noting that a substantial burden will be found where, by denying benefits, "the state puts undue pressure on the adherents [of a religious belief] to alter their behavior and to violate their beliefs in order to obtain government benefits" (citing *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 709 (1981))); *accord Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996); *see also Smith v. Artus*, No. 9:07-CV-1150 (NAM/ATB), 2010 WL 3910086, at *11 (N.D.N.Y. Sep. 30, 2010) (stating that a substantial burden exists where "government's actions pressure[d] [the inmate] to commit an act forbidden by his religion or prevent[ed] him from engaging in conduct or having a religious experience mandated by his faith") (alterations in original) (quoting *Muhammad v. City of New York Dep't of Corr.*, 904 F. Supp. 161, 188 (S.D.N.Y. 1995)), *vacated in part on other grounds by* 2013 WL 1338359 (2d Cir. Apr. 4, 2013). Although a "mere inconvenience" is insufficient to establish a

substantial burden, demonstrating a substantial burden is "not an onerous task for the plaintiff." *Pugh v. Goord*, 571 F. Supp. 2d 477, 505 (S.D.N.Y. 2008) (quoting *Singh v. Goord*, 520 F. Supp. 2d 487, 498 (S.D.N.Y. 2007)).

Plaintiff's religious-liberty claims are based on allegations of an administrative action by the DOC and subsequent conduct by Taylor that, at least indirectly, pressured Plaintiff to restrict religious practices in which he otherwise would have engaged.  Affording his allegations every favorable inference, the Court understands Plaintiff to be pleading that it was important to him to try to convince DOC to lift his allegedly erroneous SRG/gang-member classification and the harsher treatment that purportedly resulted from it, and that Defendants, including Taylor, were well aware that Plaintiff sought this relief.  (*See, e.g.*, 3d Am. Compl. ¶¶ 55-57.)  Plaintiff is also plainly alleging that Taylor's act of telling Plaintiff that his SRG classification was based, in part, on the "DOC's observation[] that [he] was . . . a *practicing Catholic*" (*id.* ¶ 57 (emphasis added)) made him believe that, in order to convince the DOC to lift the designation, he had no choice but to give up his practice of Catholicism (*see id.* ¶¶ 59-60, 101, 111).  Plaintiff further alleges that he, in fact, took significant steps to do so, requesting that his identification card be changed to omit any reference to his religion, ceasing to attend Mass, and sending home his personal Bible.  (*Id.*)  In sum, Plaintiff alleges that, through the actions of the DOC and Taylor, he was "forced to suppress his faith" (*id.* ¶¶ 101, 111), because these defendants, through Taylor's comments, made him believe that "any expression of his Catholic faith, including possessing a Bible or attending Mass, would give rise to an inference that he was a gang member" (*id.*), making it impossible for him to obtain relief from the SRG classification and its attendant hardships.

These allegations, taken as true, plausibly state a free-exercise and RLUIPA claim, at least as against Taylor, who is the correction officer who allegedly told Plaintiff of the supposed connection between his SRG classification and his religious practices.[12]  Accepting Plaintiff's allegation that Taylor knew that Plaintiff was actively seeking to have his SRG classification removed, it is plausible that Taylor knew that drawing this overt connection between the gang classification and Plaintiff's practice of his religion was likely to cause Plaintiff to feel pressured to give up his religious practices.  Certainly, the act of pressuring an inmate to stop attending religious services can constitute an impermissible burden on that inmate's free exercise of his religion.  *See Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services.").

Nonetheless, Defendants argue that Plaintiff's free-exercise and RLUIPA claims against Taylor should be dismissed because, in their words, the "causal nexus" between Taylor's alleged conduct and Plaintiff's ability to exercise his religion was too "tenuous" to support Plaintiff's claims.  (Def. Mem., at 16.)  This argument rests on (a) the supposed lack of any "affirmative steps" by Taylor to restrict Plaintiff's religious practices (Def. Mem., at 15), (b) the supposed "voluntary" nature of Plaintiff's decision to abandon his faith (*id.* at 15-16), and (c) the fact that Plaintiff does not allege that Taylor told him that, if he ceased attending Mass or sent his Bible home, his SRG classification would be changed (*id.* at 16).  None of these points are persuasive.

First, as set out above, a free-exercise or RLUIPA claim need not be based on steps taken to impose some form of restriction on an individual's religious practices; rather, coercive

---

[12] The adequacy of Plaintiff's claims against the City are addressed further below, in connection with the City's argument that Plaintiff has failed to plead facts sufficient to support municipal liability.  (*See* Discussion *infra*, at Part II(B)(2)(d).)

conduct that pressures an individual to restrict his own practices can be sufficient.  Moreover,

Taylor's alleged conduct, in informing Plaintiff of the relationship between his SRG

classification and Plaintiff's religious practices, was a form of "affirmative" conduct.

Second, courts have firmly rejected the notion that a coerced, or pressured, choice by a

plaintiff to restrict the exercise of his religion should be deemed a "voluntary" choice, capable of

defeating a claim for infringement of his right to religious liberty.  Indeed, in *Salahuddin*, the

Second Circuit reasoned that the "pertinent question" was not whether plaintiff's inability to

attend religious services was the "product of [his] own decision," but rather "*why* [plaintiff] was

put to this choice."  467 F.3d at 278-79 (emphasis added); *see also Smith*, 2010 WL 3910086, at

*12 (rejecting defendants' argument that, because plaintiff inmate could pray in his cell and

"was not *required* to go to the recreation yard during the recreation period," his religious

practice of praying at a prescribed time (which fell during the recreation period) was not

substantially burdened by a policy that prohibited demonstrative prayer in the yard) (emphasis

added).

Third, regardless of whether Taylor made Plaintiff any explicit promise that, if he

stopped practicing his Catholic religion, his gang-member classification would be removed, it is

plausible that Taylor knew that Plaintiff would at least be led to understand that, if he continued

practicing his religion, the classification would surely remain in place.  An infringement upon

free exercise may be "substantial," even where the compulsion is "indirect."  *Thomas Review Bd.

of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981).  Moreover, of the two purported bases

for his classification – his Dominican national origin and his religious practices – the latter was

the only relevant factor that Plaintiff *could* change that could reasonably affect his chances of

success in getting the classification lifted; Plaintiff is admittedly Dominican (3d Am. Compl. ¶ 58), and could do nothing to change his national heritage.

Defendants' sole remaining argument is that Plaintiff's religious-liberty claims should be dismissed for failure to plead that he made "any affirmative requests for religious accommodation that were denied by Defendants" (Def. Mem., at 16), but this argument is also unsupported by law.  While it is true that, in some cases, courts have imposed such a pleading requirement, those cases have involved particular religious deprivations.  For example, in nearly all of the cases cited by Defendants on this point, the plaintiffs complained that prison officials had failed to provide them with food required by their faith, religious books, religious services, or access to clergy. *See Messina v. Mazzeo*, 854 F. Supp. 116, 137 (E.D.N.Y. 1994) (cited in Def. Mem., at 16) (claiming denial of access to Kosher food and religious services); *Perez v. Westchester County Dep't of Corr.*, No. 05 Civ. 8120 (RMB), 2007 WL 1288579, at *3 (S.D.N.Y. Apr. 30, 2007) (cited in Def. Mem., at 16) (claiming denial of access to Halal food); *Marczeski v. Handy*, No. 3:01 CV 01437, 2004 WL 2476440, at *10 (D. Conn. Sept. 9, 2004) (cited in Def. Reply Mem., at 7) (claiming denial of access to a priest or rabbi); *Eze v. Higgins*, No. 95-CV-6S(H), 1996 WL 861935, at *4-5 (W.D.N.Y. Mar. 20, 1996) (cited in Def. Reply Mem., at 7) (claiming denial of access to Catholic services).  In such cases, it makes sense to require the plaintiffs to plead that, prior to bringing suit, they actually asked for the religious accommodations at issue and were denied.  An entirely different situation is presented here, where Plaintiff is not claiming the denial of access to religious services or books, but rather that,

with full awareness of his religious practices, Taylor pressured him to cease attending services and to give up his Bible.[13]

For all of the above reasons, this Court finds that the Third Amended Complaint plausibly alleges that, by making statements that he should have known would pressure Plaintiff to abandon the practice of his Catholic faith, Taylor substantially burdened Plaintiff's free exercise rights under both the First Amendment and RLUIPA.

### b.   Adequacy of Allegations of Personal Involvement by Defendant Taylor

In a conclusory fashion, Defendants also challenge the adequacy of Plaintiff's free-exercise and RLUIPA claims against Taylor, by asserting that Plaintiff has not adequately pleaded that Taylor was personally involved in the alleged constitutional and statutory violations.  (Def. Mem., at 16.)  Based on relevant precedent, however, Plaintiff's allegations in this regard are sufficient.

Where a Section 1983 claim has been asserted against a defendant in his individual capacity, that defendant's "personal involvement" in the alleged constitutional violation "is a prerequisite to an award of damages."  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation and internal quotations marks omitted); *accord Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 886 (2d Cir. 1987); *see also Fisk v. Letterman*, 401 F. Supp. 2d 362, 373-74 (S.D.N.Y. 2005) (dismissing plaintiff's § 1983 claim

---

[13]  The only remaining case cited by Defendants on this point, *Nicholas v. Raro*, No. 95-CV-379H, 1997 WL 255291 (W.D.N.Y. Apr. 7, 1997), is also inapposite, as, in that case, the plaintiff was found by the court to have made no allegation that the defendants "infringed upon his right to practice his faith in any way," *id*. at *5.  Instead, the court determined that the plaintiff was actually asserting a retaliation claim, based on the defendants' alleged pursuit of a false disciplinary charge against him.  *See id*.

where she failed to allege facts showing that the defendant had been involved in the deprivation of her rights).  In particular, to recover from a particular individual defendant, a plaintiff must "'allege a tangible connection between the acts of the defendant and the injuries suffered.'" *Gowins v. Greiner*, No. 01 Civ. 6933 (GEL), 2002 WL 1770772, at *20 (S.D.N.Y. July 31, 2002) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)).  Similarly, "[p]ersonal involvement is also a prerequisite to a defendant's liability under RLUIPA."  *Vann v. Fischer*, No. 11 Civ.1958 (JPO), 2012 WL 2384428, at *5 (S.D.N.Y. June 21, 2012) (citing *Joseph v. Fischer*, No. 08 Civ. 2824 (PKC), 2009 WL 3321011, at *17-18 (S.D.N.Y. Oct. 8, 2009)).

Plaintiff asserts his First Amendment and RLUIPA claims against Taylor in both his individual and official capacities.  (*See* 3d Am. Compl. ¶¶ 96-105, 121-126.)[14]  As a general matter, Plaintiff alleges that Taylor, acting under the color of state law, "permitted, tolerated and [was] deliberately indifferent to the violation of Plaintiff's rights under the First and Fourteenth Amendment[s]" and RLUIPA.  (*Id.* ¶¶ 97, 122.)  More specifically, with respect to Taylor's personal involvement in the claimed violations, Plaintiff alleges that, with knowledge that Plaintiff was an "observant, practicing" Catholic, Taylor informed Plaintiff that "openly practicing his faith was the basis for his misclassification as a gang member" (*id.* ¶¶ 99-100; *see also id.* ¶¶ 122-123), making Plaintiff believe that any expression of his Catholic faith, including attending Mass or having a Bible, "would give rise to an inference that he was a gang member," thereby "forc[ing] Plaintiff . . . to suppress his faith" (*id.* ¶ 101).

---

[14] Although, in each count against Taylor, Plaintiff does not actually specify whether he is seeking relief from Taylor in his individual or official capacity, Plaintiff has named all of the Individual Defendants in both their individual and official capacities, in the caption of his Third Amended Complaint.

For pleading purposes, this is sufficient to satisfy the requirement that Plaintiff allege that Taylor was personally involved with the asserted impingement on Plaintiff's religious liberty. As discussed above, Plaintiff has essentially pleaded that, but for Taylor's conduct, Plaintiff would not have felt a substantial pressure to cease practicing his religion.  This is a sufficiently "tangible connection" between Taylor's conduct and the injuries Plaintiff allegedly suffered to state plausible First Amendment and RLUIPA claims against Taylor, in his individual capacity. Thus, unless Taylor can, at this stage, demonstrate entitlement to qualified immunity on Plaintiff's religious-liberty claims, I recommend that these claims against Taylor, as named in his individual capacity, be permitted to proceed.

### c.    Taylor's Assertion of Qualified Immunity

Defendants contend that, in any event, Plaintiff's religious-liberty claims against Taylor must be dismissed because he is entitled to qualified immunity.[15]  (Def. Mem., at 17-18.)  On the basis of Plaintiff's pleading alone, however, it is premature for the Court to make such a determination.

The doctrine of qualified immunity "protects prison officials from personal liability [for damages] under § 1983 when their 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Horne v. Coughlin*, 155 F.3d 26, 29 (2d Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982));

---

[15] Although, as a general matter, all of the Individual Defendants have asserted entitlement to qualified immunity in this case, with respect to all of Plaintiff's federal claims, the Court need only reach the issue with respect to Plaintiff's religious-liberty claims against Taylor, given that, for the reasons stated herein, Plaintiff's other federal claims against the Individual Defendants should be dismissed on other grounds. *See Peterson v. Tomaselli*, No. 02 Civ. 6325 (DC), 2003 WL 22213125, at *8 (S.D.N.Y. Sept. 29, 2003) (where motion to dismiss is granted based on failure to state a claim, the qualified immunity argument need not be reached).

*Rodriguez v. Phillips*, 66 F.3d 470, 475 (2d Cir. 1995)).  A qualified immunity defense, though, is typically addressed at the summary judgment stage because it usually depends on the facts of the case, making dismissal at the pleading stage generally inappropriate.  *King v. Simpson*, 189 F.3d 284, 289 (2d Cir. 1999); *Woods v. Goord*, 2002 WL 731691, at *10.  Accordingly, a motion to dismiss on qualified-immunity grounds will only be granted "if the complaint fails to allege the violation of a clearly established right."  *Woods*, 2002 WL 731691, at *10 (quoting *Hardy v. Jefferson Community Coll.*, 260 F.3d 671, 677 (6th Cir. 2001)).

As discussed above (*see* Discussion *supra*, at Part II(B)(2)(c)), Plaintiff's Third Amended Complaint states a claim against Taylor for a violation of Plaintiff's constitutional right to the free exercise of his religion, as well as a statutory claim under RLUIPA.  At the time of the alleged violations in May 2011, it was clearly established that "prison officials may not substantially burden inmates' rights to religious exercise without some justification." *Salahuddin*, 467 F.3d at 275-76; *see also Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989) ("[W]e have long held that prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible.").  While discovery may yield evidence showing that any conduct by Taylor was "objectively reasonable" in the circumstances, the Court cannot now reach this conclusion, as a matter of law.  *See Salahuddin*, 467 F.3d at 275-76; *Amaker v. Haponik*, No. 98 Civ. 2663 (JGK), 2000 WL 343772, at *6 (S.D.N.Y. Mar. 31, 2000) (holding that the complaint should not be dismissed on qualified immunity grounds where "the facts [were] not sufficiently developed at this stage in the proceedings to conclude that a reasonable officer would not have concluded that defendants' actions were unlawful"); *Burgess*, 1999 WL 33458, at *5-6 (S.D.N.Y. Jan 26, 1999) (although defendants argued that it was objectively

reasonable for them to believe their actions were lawful, "dismissal on the basis of qualified immunity would be premature" where plaintiff had adequately pleaded a claim).

Accordingly, I recommend that Defendants' motion to dismiss Plaintiff's religious-liberty claims against Taylor, in his individual capacity, be denied.

### d.   **Municipal Liability**

As for the City, Defendants argue that the Third Amended Complaint fails to plead sufficient facts to support a claim for municipal liability for any First Amendment or RLUIPA violation.[16]  (Def. Mem., at 19-21.)  This Court agrees that Plaintiff's religious-liberty claims against the City should be dismissed on this ground.

To recover against a municipality or municipal agency, a plaintiff must allege that the deprivation of his rights was caused by the execution of an official policy, custom, or practice. *See Monell v. City of New York Dep't of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978); *Reynolds v. Giuliani*, 506 F.3d 183, 190-91 (2d Cir. 2007); *Walker v. City of New York*, 974 F.2d 293, 296 (2d Cir. 1992)  A plaintiff may satisfy the "policy, custom, or practice" requirement by alleging the existence of:

> (1) a formal policy officially endorsed by the municipality;
> (2) actions taken by government officials responsible for
> establishing the municipal policies that caused the particular
> deprivation in question; (3) a practice so consistent and widespread

---

[16] As with the question of qualified immunity, the Court need not consider the adequacy of Plaintiff's allegations of municipal liability with respect to any of Plaintiff's federal claims other than his religious-liberty claims, as those other claims are subject to dismissal for other reasons.  *See Wolff v. Town of Mount Pleasant*, No. 06 Civ. 3864 (CS) (LMS), 2009 WL 1468691, at *4 (S.D.N.Y. Apr. 27, 2009) (noting that, where Rule 12(b)(6) dismissal of plaintiff's First Amendment claim was appropriate, the court "need not consider whether [p]laintiff's allegations against [defendant] satisfy the *Monell* standard for stating a claim for relief against a municipal entity"), *report and recommendation adopted in relevant part by* 2009 WL 1468620 (May 26, 2009).

> that it constitutes a custom or usage sufficient to impute
> constructive knowledge of the practice to policymaking officials;
> or (4) a failure by policymakers to train or supervise subordinates
> to such an extent that it amounts to deliberate indifference to the
> rights of those who come into contact with the municipal
> employees.

*Hernandez v. City of New York*, No. 00 Civ. 9507 (RWS), 2004 WL 2624675, at *4 (S.D.N.Y.

Nov. 18, 2004) (citations omitted).  In this case, Plaintiff appears to argue that he has adequately

pleaded three of the four possible bases on which the City (through the DOC) could be held

liable for the claimed violation of his free-exercise rights:  first, Plaintiff asserts that, at Rikers,

the DOC had a "policy" of mis-classifying inmates as members of the Patria/Trinidadio gang

solely because those inmates were "practicing Catholics of Dominican descent"[17] (Pl. Mem., at

17); second, he seems to contend that, even if this was not a formal policy, it was a "widespread"

practice (*see id.*); and, third, he appears to argue, although without explanation, that the DOC

failed to engage in the proper training of Rikers corrections officers with respect to such

classifications (*see id.*).  A close look at Plaintiff's pleading reveals that none of these bases for

municipal liability is supported by adequate factual allegations.

     As to the DOC's "policy" or "practice" of mis-classifying inmates based, in relevant part,

on their religion, all the Third Amended Complaint actually pleads is that Plaintiff was told, in a

single conversation with a single correction officer, that Plaintiff's own SRG classification was

based on his Dominican nationality and his Catholic religion.  Plaintiff's pleading says nothing

---

[17] In his brief, Plaintiff also appears to contend that he has pleaded a *Monell* claim against the City based on the DOC's purported "policy" of confiscating Bibles.  (*See* Pl. Mem., at 17.) In the Third Amended Complaint, however, Plaintiff does not actually plead a separate *Monell* claim directed to this supposed policy.  (*See* 3d Am. Compl. ¶¶ 106-20, 127-37.)  Rather, as discussed above, Plaintiff's religious-liberty claims against the City are fairly construed to be based on the reported connection between his *SRG classification* and the practice of his faith, and how this *connection* pressured him to suppress the exercise of his religion (*see id.* ¶ 111).

about the classification of any other inmate, but rather speculates, based on Taylor's alleged remarks, that Plaintiff's own mis-classification was indicative of a general policy or wide-scale practice.  As the Second Circuit has held, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (citation and internal quotation marks omitted).  Thus, as an initial matter, Plaintiff's allegations do not indicate the existence of a formal policy or "a practice so persistent and widespread that it constitutes a custom or usage" of classifying inmates as members of the Patria/Trinidadio gang based, at least in part, on the inmates' religion.

Morover, while Plaintiff makes the conclusory allegation that the DOC "knew that inmates were aware that [their religion] was a basis of classification" (3d Am. Compl. ¶ 108), he pleads absolutely no facts to support the proposition that (a) any inmates other than himself were ever made aware of the purported classification policy, or (b) the DOC had any reason to know that inmates had such an awareness.  Without awareness by inmates of the purported basis of their classification, there could have been no pressure on those inmates to restrict their religious practices, and thus no "substantial burden" on their free-exercise rights.  Thus, even if Plaintiff has adequately pleaded that the DOC had a policy or practice of classifying inmates as gang members based on religious criteria, Plaintiff cannot be found to have plausibly alleged that this policy or practice restricted any inmate's free exercise of his religion, in the absence of pleaded facts suggesting that it was an official or routine practice of the DOC to *inform* inmates of the basis for their classification.

The only allegations made by Plaintiff relating to inmates' knowledge of their gang-member classifications are Plaintiff's allegations that Bibles were being confiscated from gang

36

members (*id*. ¶ 60), and that the so-called "Alpha Sheet," listing inmates and alleged gang

affiliations, was "prominently displayed" in a location where it could be viewed by the inmates

(*id*. ¶¶ 64-67).  Yet confiscating the Bible of an inmate classified as a gang member is not the

same as informing the inmate that his religion provided the *reason* for the underlying gang

classification.  Certainly, Plaintiff's allegation regarding the confiscation of Bibles that

correction officers suspected of "being used by gang members to exchange messages" (*id*. ¶ 60)

gives rise to no particular inference that inmates who were classified as members of the

*Patria/Trinidadio* gang were thereby made aware that their classification was based on their

*Catholic* religion.  Further, as to the alleged posting of the Alpha Sheet, while Plaintiff alleges

that this posting was visible to inmates, Plaintiff also appears to allege that he, himself, did not

know that he was classified as a member of the Patria/Trinidadio gang, or – more to the point –

*why* he was classified that way, until Taylor told him on May 7, 2011, a year after he was

detained at Rikers and given an SRG classification.  (*Id*. ¶ 57.)  Indeed, Plaintiff has not alleged

that there was anything inherent in an inmate's identification, on the Alpha Sheet, as a member

of the Patria/Trinidadio gang that would convey that this classification was based on the

inmate's practice of Catholicism.  In short, nothing in Plaintiff's Third Amended Complaint

suggests that it was part of the DOC's policy or practice to inform Catholic inmates that they had

been assumed to be members of the Patria/Trinidadio gang based, in part, on their religion.

   Finally, as to Plaintiff's alternative claim that the City should be held liable because it

"fail[ed] to train and supervise DOC officials responsible for ensuring that pre-trial detainees and

inmates were able to exercise their religious liberties" (3d Am. Compl. ¶ 117; *see also* Pl. Mem.,

at 17), and that this failure amounted to  "deliberate[] indifferen[ce] to the violation of Plaintiff's

rights under the First and Fourteenth Amendment" (3d Am. Compl. ¶ 107; *see also id*.

¶¶ 109-113, 116, 128-33; Pl. Mem., at 17), Plaintiff, once again, pleads no factual allegations

sufficient to render his claim plausible, *see Simms v. City of New York*, 480 Fed. App'x 627, 630

& n.4 (2d Cir. 2012) (rejecting plaintiff's contention that "the mere conclusory allegation that

the City failed to train its officers, without any supporting factual material, is sufficient to state a

plausible claim for municipal liability under § 1983").  Although a plaintiff is not required to

allege specific inadequacies in a training program, he must at least allege facts suggesting that

the municipality was on notice "that a particular omission in their training program causes city

employees to violate citizens' constitutional rights." *Connick v. Thompson*, 131 U.S. 1350, 1360

(2011).  Here, Plaintiff's allegations regarding a single unlawful act by Taylor is not enough.

*See id.* (noting that "[a] pattern of similar constitutional violations by untrained employees is

'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train").

Further, although, with respect to his purported "failure to train" claim, Plaintiff highlights his

allegation that the Alpha Sheet would have been visible to correction officers (*see* Pl. Mem.,

at 17), nothing about the purported contents of that listing suggests that it even would have made

the officers aware of the religious criteria that were allegedly behind the listed classifications,

much less that it put DOC employees on notice that "a particular omission in their training

program" was causing them to violate certain inmates' religious liberties.

   In sum, because the facts pleaded by Plaintiff are insufficient to allow the Court "to draw

the reasonable inference that [the City] is liable for the misconduct alleged" under any of the

theories of municipal liability put forth by Plaintiff, *Simms*, 480 Fed. App'x at 630 (quoting

*Iqbal*, 556 U.S. at 678), I recommend that the Court dismiss Plaintiff's First Amendment and RLUIPA claims against the City, as well as his claims against Taylor in his official capacity.[18]

  **e.**  **Compensatory Relief**

  Defendants contend that, under the PLRA, Plaintiff cannot recover compensatory damages for his emotional injuries, and that all of Plaintiff's claims for compensatory damages must therefore be dismissed.  (Def. Mem., at 21-22.)  In making this argument, however, Defendants fail to draw a necessary distinction between Plaintiff's claims for compensatory damages for emotional injuries – claims which should, in fact, be dismissed in this case – and distinct claims that he may be asserting for injury to his First Amendment rights – claims which should be permitted to proceed.

  Section 1997e(e) of the PLRA provides that "[n]o Federal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e); *see also Thompson v. Carter*, 284 F.3d 411, 418 (2d Cir. 2002) (holding that 42 U.S.C. § 1997e(e) applies to "all federal civil actions including claims alleging constitutional violations").  While this section is not a bar to suit, it does serve as a limitation on remedies an incarcerated individual can receive for actions seeking damages for mental or emotional injury in the absence of a showing of physical injury.  *See Thompson*, 284 F. 3d at 418.[19]

---

[18] Dismissal of Plaintiff's claims against the City for failure to plead an adequate basis for municipal liability would require dismissal of the claims against Taylor in his official capacity, as well.  *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Reynolds*, 506 F.3d at 191 ("An official capacity suit against a public servant is treated as one against the governmental entity itself.").

[19] Even in the absence of physical injury, Section 1997e(e) does not restrict the recovery of other types of relief, including "nominal or punitive damages, or injunctive and declaratory relief."  *Id.*

Here, while Plaintiff alleges that he suffered physical injuries from searches conducted as a result of his ICR and SRG classifications (*see, e.g.*, 3d Am. Compl. ¶¶ 38, 69, 74, 81, 87, 94), these allegations, even if accepted as true, do not describe injuries that are sufficiently related to Plaintiff's First Amendment and RLUIPA claims to satisfy the PLRA's physical injury requirement for those claims.  Indeed, Plaintiff does not allege that he suffered any physical injury as a result of his First Amendment and RLUIPA claims, which relate to his being pressured to give up his religious practices.  (*See id.* ¶¶ 96-105, 121-126.) Accordingly, under the PLRA, Plaintiff is not entitled to compensation for any claims that he may be asserting for emotional injury arising out of the restriction of his religious liberties.

What Defendants fail to address, however, is that deprivations of liberty and personal rights can give rise to damages separate and apart from those recoverable for any physical injury or emotional suffering.  *See Kerman v. City of New York*, 374 F.3d 93, 125-26 (2d Cir. 2004) ("The damages recoverable for [plaintiff's Fourth Amendment claim is] for the period spent in a wrongful confinement are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering; even absent such other injuries, an award of several thousand dollars may be appropriate simply for several hours' loss of liberty.").  Thus, the Second Circuit has noted that, even in the absence of physical injury, Section 1997e(e) will not bar a plaintiff from recovering compensatory damages for alleged "injuries to his First Amendment rights."  *Toliver v. City of New York*, 2013 WL 3817836, at *2  n.2 (2d Cir. July 24, 2013) ("[E]ven if [plaintiff] is unable to establish that any of the injuries complained of in this action stemmed from an incident in which he suffered physical injuries, [plaintiff] may still recover damages for injuries to his First Amendment rights, as well as nominal and punitive damages for any other constitutional violations."); *see also Canell v. Lightner*, 143 F.3d 1210,

1213 (9th Cir. 1998) ("The deprivation of First Amendment rights entitles a plaintiff to judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred. Therefore, § 1997e(e) does not apply to First Amendment [c]laims regardless of the form of relief sought."); *Malik v. City of New York*, No. 11 Civ. 6062 (PAC) (FM), 2012 WL 3345317, at *16-17 (S.D.N.Y. Aug. 15, 2012) (holding that "the PLRA's physical injury requirement does not bar an award of compensatory damages for First Amendment violations"), *report and recommendation adopted by* 2012 WL 4475156 (S.D.N.Y. Sep 28, 2012); *Lipton v. County of Orange, N.Y.*, 315 F. Supp. 2d 434, 457-58 (S.D.N.Y. 2004) ("[A] First Amendment deprivation presents a cognizable injury standing alone and the PLRA 'does not bar a separate award of damages to compensate the plaintiff for the First Amendment violation in and of itself.'" (quoting *Ford v. McGinnis*, 198 F. Supp. 2d 363, 366 (S.D.N.Y. 2001), and collecting cases)).

Based on the foregoing authority, any claims that Plaintiff may be asserting for compensatory damages for "injuries to his First Amendment rights" would not be barred by the PLRA and should be allowed. As Plaintiff, however, has not alleged a physical injury resulting from the claimed First Amendment and RLUIPA violations, I recommend that the Court dismiss, pursuant to Section 1997e(e), any claims for compensatory damages that he may be asserting for emotional injury resulting from those violations. *See Akey v. Haag*, No. 1:05-CV-331, 2006 WL 3246146, at *4 (D. Vt. Oct. 4, 2006) (allowing plaintiff's claims for compensatory damages resulting from First Amendment violation to proceed, but dismissing plaintiff's claims for emotional damages (citing *Ford*, 198 F. Supp. 2d at 366)), *report and recommendation adopted by* 2006 WL 3251508 (D. Vt. Nov. 3, 2006).

41

C.   **Pendent State Law Claims**

Defendants also argue that, if the Court dismisses all claims over which it has original

jurisdiction, then the Court should also dismiss Plaintiff's state-law claims under Rule 12(b)(1),

for lack of subject matter jurisdiction.  As Plaintiff has adequately pleaded federal claims for

violations of the First Amendment and RLUIPA, however, I recommend that Defendants'

motion to dismiss Plaintiff's state-law claims be denied, and that the Court continue to exercise

supplemental jurisdiction over those claims, pursuant to 28 U.S.C. § 1367.

## CONCLUSION

For all of the foregoing reasons, I hereby recommend that Defendants' motion to dismiss

the Third Amended Complaint (Dkt. 45) be granted in part, and denied in part, as follows:

(1)     Plaintiff's 14th Amendment claims against all Defendants (Counts I through IV)
should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim;

(2)     Plaintiff's First Amendment and RLUIPA claims against Taylor (Counts V and
VII) should be permitted to proceed, to the extent that Plaintiff seeks damages
against Taylor in his individual capacity;

(3)     Plaintiff's First Amendment and RLUIPA claims against the City (Counts VI
and VIII), and against Taylor in his official capacity, should be dismissed under
Fed. R. Civ. P. 12(b)(6) for failure to state a claim;

(4)     Plaintiff's claims for compensatory damages for emotional injuries as a result
of his First Amendment and RLUIPA violations should be dismissed under
42 U.S.C. § 1997e(e); and

(5)     the Court should continue to exercise supplemental jurisdiction, pursuant to
28 U.S.C. § 1367, over Plaintiff's claims under state tort law (Counts IX and X).

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b)(2) of the Federal Rules of Civil

Procedure, the parties shall have 14 days from the date of this Report and Recommendation to

file written objections.  *See also* Fed. R. Civ. P. 6(a) and 6(d) (allowing three additional days

where service has been made by mail).  Such objections, and any responses thereto, shall be filed

with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable

Paul A. Crotty, United States District Judge, 500 Pearl Street, Room 735, New York, New York

10007, and to the chambers of the undersigned, 500 Pearl Street, Room 1660, New York, New

York 10007.  Any requests for an extension of time for filing objections must be directed to

Judge Crotty.  FAILURE TO OBJECT WITHIN 14 DAYS WILL RESULT IN A WAIVER OF

OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  *Thomas v. Arn*, 474 U.S. 140

(1985); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v.*

*Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 57-59 (2d

Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
       September 3, 2013

                    Respectfully Submitted,

                    DEBRA FREEMAN
                    United States Magistrate Judge

**Copies to**:

Hon. Paul A. Crotty, U.S.D.J.

All counsel (via ECF)